# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

# 04   10454 DPW

BRIAN CLARK, Individually and on Behalf
of All Others Similarly Situated,

                Plaintiff,

        vs.

SONUS NETWORKS, INC., PAUL R. JONES,
EDWARD N. HARRIS, J. MICHAEL O'HARA,
HASSAN M. AHMED and STEPHEN J. NILL,

                Defendants.

Civil Action No.

CLASS ACTION COMPLAINT
FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

MAGISTRATE JUDGE Bowler

DEMAND FOR JURY TRIAL

RECEIPT #
AMOUNT $ 150
SUMMONS ISSUED (l)
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK. for
DATE 2|5|04

## CLASS ACTION COMPLAINT

Plaintiff alleges the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Sonus Networks, Inc. ("Sonus" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by Sonus, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of the purchasers of the securities of Sonus during the period from July 11, 2003 to February 11, 2004, inclusive (the "Class Period").

2.      Sonus is a provider of voice infrastructure solutions. The Company's products are a new generation of carrier-class switching equipment and software that enable voice services to

be delivered over packet-based networks. By enabling voice traffic to be carried over these packet-based networks, the Company's products will accelerate the convergence of voice and data into the new public network. The Company's suite of voice infrastructure solutions includes the GSX9000 Open Services Switch, the Insignus Softswitch and the Sonus Insight Management System.

3.    Throughout the Class Period, defendants touted Sonus' strong financial performance and revenue growth. Unbeknownst to investors, the Company's revenues and certain other financial statement accounts were misstated as a result of Sonus' improper revenue recognition practices.

4.    On February 11, 2004, the Company shocked the market when it announced that it had identified certain issues, practices and actions of certain employees relating to both the timing of revenue recognized from certain customer transactions and to certain other financial statement accounts, which may affect the Company's 2003 financial statements and possibly financial statements for prior periods. Sonus also announced that it was reassessing the proper periods in which revenue should be recognized for these transactions.

5.    The next morning, when the market opened for trading, Sonus' stock fell as low as $5.02 per share, a decline of $1.67 per share, or 24.9%, on extremely high trading volume.

## JURISDICTION AND VENUE

6.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

7.    This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. § 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

8.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

9.    In connection with the wrongs alleged herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

10.    Plaintiff Brian Clark purchased the securities of Sonus as detailed in the attached Certification and was damaged thereby.

11.    Defendant Sonus is incorporated in Delaware, and maintains its principal place of business within this judicial district at 5 Carlisle Road, Westford, MA 01886.

12.    Defendant Paul R. Jones ("Jones") was a Vice President of Sonus. Jones assisted in the preparation of the false financial statements and repeated the contents therein to the market.

13.    Defendant Edward N. Harris ("Harris") was a Vice President of Sonus. Harris assisted in the preparation of the false financial statements and repeated the contents therein to the market.

14.    Defendant J. Michael O'Hara ("O'Hara") was a Vice President of Sonus. O'Hara assisted in the preparation of the false financial statements and repeated the contents therein to the market.

15.    Defendant Hassan M. Ahmed ("Ahmed") was President, Chief Executive Officer

and a director of Sonus. Ahmed assisted in the preparation of the false financial statements and repeated the contents therein to the market.

16.    Defendant Stephen J. Nill ("Nill") was Chief Financial Officer of Sonus. Nill assisted in the preparation of the false financial statements and repeated the contents therein to the market.

17.    Defendants Jones, Harris, O'Hara, Ahmed and Nill are collectively referred to herein as the "Individual Defendants."

18.    As a result of the Individual Defendants' positions with Sonus, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including, inter alia, the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

19.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of Sonus, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning Sonus and its business,

operations, growth, financial statements, and financial condition, as alleged herein. Said

defendants were involved in drafting, producing, reviewing and/or disseminating the false and

misleading statements and information alleged herein, were aware, or recklessly disregarded, that

the false and misleading statements were being issued regarding the Company, and approved or

ratified these statements, in violation of the federal securities laws.

20.    As officers and controlling persons of a publicly-held company whose securities

stock were, and are, registered with the SEC pursuant to the Exchange Act, and which traded on

the NASDAQ National Market ("NASDAQ"), and who were governed by the provisions of the

federal securities laws, the Individual Defendants each had a duty to disseminate promptly,

accurate and truthful information with respect to the Company's financial condition and

performance, growth, operations, financial statements, business, markets, management, earnings

and present and future business prospects, and to correct any previously-issued statements that had

become materially misleading or untrue, so that the market price of the Company's publicly-traded

securities would be based upon truthful and accurate information. The Individual Defendants'

misrepresentations and omissions during the Class Period violated these specific requirements and

obligations.

21.    The Individual Defendants participated in the drafting, preparation, and/or approval

of the various public, shareholder and investor reports and other communications complained of

herein and were aware of, or recklessly disregarded, the misstatements contained therein and

omissions therefrom, and were aware of their materially false and misleading nature. Because of

their Board membership and/or executive and managerial positions with Sonus, each of the

Individual Defendants had access to the adverse undisclosed information about Sonus' business

prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Sonus and its business, issued or adopted by the Company, materially false and misleading.

22.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Sonus, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants bears responsibility for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

23.    Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Sonus securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding the Company's business, operations, management and the intrinsic value of Sonus securities; and (ii) caused plaintiff and other members of the Class to purchase Sonus securities at artificially inflated prices.

## FALSE AND MISLEADING STATEMENTS
## DURING THE CLASS PERIOD

24.    On July 10, 2003, after market close, Sonus issued a press release entitled "Sonus Networks Reports 2003 Second Quarter Financial Results" announcing its financial results for the second quarter of 2003, the period ended June 30, 2003. Sonus Reported revenues of $21.4

million and a net loss of $3.2 million or $0.01 per share. The press release stated in part:

> Sonus Networks, Inc., a leading provider of voice infrastructure solutions for the new public network, Thursday reported its financial results for the second quarter ended June 30, 2003.

> Revenues for the second quarter of fiscal 2003 were $21.4 million compared with $16.0 million for the first quarter of fiscal 2003 and $21.3 million for the second quarter of fiscal 2002. Net loss for the second quarter of fiscal 2003 was $3.2 million or $0.01 per share compared with a net loss for the first quarter of fiscal 2003 of $4.4 million or $0.02 per share and a net loss of $17.8 million or $0.09 per share for the second quarter of fiscal 2002.

> Revenues for the first six months of fiscal 2003 were $37.4 million compared with $42.5 million in the same period last year. Net loss for the first six months of fiscal 2003 was $7.6 million or $0.04 per share compared with a net loss for the first six months of fiscal 2002 of $34.0 million or $0.18 per share.

> We are pleased with the progress that we made in the second quarter, particularly with our 33% sequential revenue growth. We executed across all areas of the business- broadening and strengthening our customer base, expanding our leading product offering, bolstering our balance sheet and advancing our drive to profitability.

Defendant Ahmed continued, stating in pertinent part, as follows:

> Our revenue growth, coupled with premier customer wins like Verizon Communications underscores our belief that the packet voice market is entering a new phase. Incumbent carriers are now adopting packet voice solutions and Sonus Networks is proud to be at the forefront of this transition.

25.    On July 18, 2003, *Bloomberg* issued a release entitled "Sonus is 'Driving Toward Profitability,' Chief Executive Says." The press release stated in part:

> Sonus Networks Inc., a telecommunications-equipment maker, is trying to become profitable, Chief Executive Officer Hassan Ahmed said.

> ***"We're definitely driving toward profitability as fast as we can," Ahmed said in a televised interview with Bloomberg News. He said he hasn't given guidance on the third quarter and whether Sonus would post a profit. Ahmed said the company expects sales from outside the U.S. to eventually increase to 50 percent of its total revenue.***

26.    On July 18, 2003, defendant Harris sold 30,000 Sonus shares at $6.82 per share, for proceeds of $204,600.

27.    On July 22, 2003, defendant O'Hara sold 55,000 Sonus shares at $6.82-$7.03 per share, for proceeds of $381,200.

28.    On August 1, 2003, the Company issued a press release entitled, "Sonus Networks Issues Statement Regarding Incorrect Report On Financial Guidance." The press release stated in part:

> Sonus Networks today issued the following statement regarding erroneous and false information reported by Multex on July 31. An article appeared on Multex Investor indicating that Sonus Networks had revised its financial guidance for Q3 FY2003 and for the fiscal year 2003. The information included in the article was incorrect and was not provided by the company.
>
> **With regard to its projected future results, Sonus Networks refers you to the financial guidance provided as part of its Q2 quarterly financial conference call on July 10, 2003, which included, among other things, that it expects its revenues to increase in the third quarter of FY2003 by 15-20% over reported second quarter 2003 revenues of $21.4 million. For more detailed information on the guidance provided by the company, please refer to the webcast of this conference call, which can be accessed in the Investor Relations section of Sonus' web site at www.sonusnet.com.**

29.    On August 14, 2003, Sonus filed with the SEC its Quarterly report on Form 10-Q for the second quarter ended June 30, 2003 (the "Second Quarter 10Q"). The Second Quarter 10-Q repeated the same materially false and misleading information contained in the July 10th press release.

30.    On October 8, 2003, the Company issued a press release entitled "Sonus Networks Reports 2003 3Q Fincl Results; Rev Grow 34% Sequentially, 285% Over Previous Year; Co Achieves Qtrly Profit." The press release stated in part:

Sonus Networks Inc. - Westford, Mass.

3rd Quar Sept. 30:

|  | 2003 | 2002 |
|---|---|---|
| Revenue | $28,644,000 | $7,445,000 |
| Net income | 1,209,000 | (21,638,000) |
| Avg shrs (diluted) | 239,446,000 | 191,823,000 |
| Shr earns |  |  |
| Net income | .01 | (.11) |

Figures in parentheses are losses.

Excluding amortization of stock-based compensation, amortization of goodwill and purchased intangible assets, and the write-off of goodwill, Sonus earned $2.35 million, or a penny a share, in the latest quarter, up from a loss of $14.6 million, or 8 cents a share, a year ago.

Analysts had expected the company to lose a penny a share for the quarter, according to a survey of analysts compiled by Thomson First Call.

Shares of Sonus closed the regular session Wednesday at $8.30, up 27 cents a share, or 3.4%. In after-hours trading, shares rose further to $8.93 a share.

31.    On October 9, 2003, *Bloomberg* issued a release entitled "Sonus Networks'

Ahmed on Earnings Outlook." The release stated in part:

Hassan Ahmed, chief executive of Sonus Networks Inc., talks with Bloomberg's Carol Massar from Boston about the company's third-quarter profit, spending by telecommunications companies and outlook for earnings growth. Sonus, a telecommunications-equipment maker, reported net income of $1.2 million, its first ever quarterly profit.

* * *

AHMED: Good morning, Carol. How are you?

MASSAR: I'm doing well. And your stock's doing well in the pre-market. It is trading higher already. Investors certainly seem improved [sic] with your earnings results. What was the reason behind the earnings improvement?

AHMED: Well, one of the things that we've been able to do this year is consistently grow our top line, our revenues, based on not only the strength of our existing customers but the addition of major new customers such as Verizon, for

example, into the mix. And so, our top line has grown. We've been managing our expenses very carefully and all that's led to a profit. And also, we generated about $4 million in cash from operations.

MASSAR: Viewing the marketplace really, we're not seeing a lot of companies spending, and now you're saying that we were starting to see that. My understanding is that earnings will improve because companies like Qwest and Global are stepping up their spending. Who else is placing orders with you guys?

AHMED: Well, you know, it's interesting, the – in our marketplace what's happening is that while overall telcom spending still isn't increasing carriers are being much more careful about how they're spending the money, and they're shifting expenditure towards their next-generation networks. And what we do in terms of building next-gen voice networks has – is a very high priority for a number of these carriers. So, really across the board in the U.S. as well as overseas we're seeing carriers take packet collecting and voice-over-IP technology a lot more seriously and stepping up to deploying it.

*MASSAR: What does that mean for your earnings going forward then?*

*AHMED: Well, certainly a big part of our focus is on growing our company and broadening our customer base. So, we're very much focused on continuing to grow the top line in our company and, obviously as a result of that, grow the bottom line.*

*MASSAR: What about the bottom line? Take this quarter. Analyst consensus expecting earnings to be flat. Is that what you're expecting at this point?*

*AHMED: We're – our guidance that we offered last night certainly is for earnings to come in about the same level as it did this quarter and for the top line to grow somewhere between 10 and 15 percent.*

    32.    On October 10, 2003, defendant Jones sold 100,000 Sonus shares at $8.58

per share, for proceeds of $858,000.

    33.    On October 22, 20023, defendant O'Hara sold 13,750 Sonus shares at

$7.85-$7.91 per share, for proceeds of $108,413.

    34.    On January 20, 2004, *Bloomberg* issued a release entitled "Sonus

Networks Delays Release of 4th-Qtr Results Pending Audit." The release stated in part:

> Sonus Networks Inc., a maker of switches and networking equipment for Internet calling, said it delayed the release of its fourth-quarter results pending the completion of an audit.

35.    On February 11, 2004, the Company issued a press release entitled "Sonus Networks Provides Update on Status of Its Q4 and FY2003 Financial Results." The press release stated in part:

> Sonus Networks today provided additional information regarding the delay in reporting its fourth quarter and full fiscal year financial results for the year ended December 31, 2003. In connection with the year-end audit, Sonus Networks and its independent auditors have identified certain issues, practices and actions of certain employees relating to both the timing of revenue recognized from certain customer transactions and to certain other financial statement accounts, which may affect the Company's 2003 financial statements and possibly financial statements for prior periods.
>
> The revenue issues identified relate to the proper timing of recognizing revenue from certain customer transactions, and not whether the sales can be recorded as revenue. For the customer transactions under review, the products have been delivered, customers are using the products in their networks and Sonus Networks has either received payment or is receiving payment for the products in the ordinary course. The Company is reassessing the proper periods in which revenue should be recognized for these transactions. Revenue or deferred revenue in periods previously reported could increase, decrease or remain unchanged in those periods as a result of this reassessment.
>
> In response to the issues identified, the Company has taken the following steps:
>
> –    The Company is performing a detailed review of the revenue timing issues and practices and of certain other financial statement accounts.
>
> –    The Audit Committee of Sonus Networks' Board of Directors is conducting an independent investigation, employing the services of Hale and Dorr LLP and PricewaterhouseCoopers.
>
> –    The Company has terminated certain non-executive employees.

–   Sonus Networks has notified the Securities and Exchange Commission of the Company's independent investigation and is fully reporting the results of that ongoing investigation to the Commission.

"We are deeply concerned and disappointed to have discovered that certain employees at Sonus Networks were engaged in behavior that violated our code of conduct and may have compromised the integrity of our financial reporting," said Hassan Ahmed, president and CEO, Sonus Networks. "The Company responded promptly by taking appropriate measures to address these matters. We assure our shareholders, customers and employees that our management and Board of Directors are committed to taking all necessary steps to complete our review in an expeditious and comprehensive manner, and to prevent such problems from occurring in the future."

At this time, Sonus Networks cannot provide an anticipated date for the completion of its review or the year-end audit, or for the rescheduling of the release of its fourth quarter and fiscal year results for the year ended December 31, 2003.

## SONUS' FALSE FINANCIAL
## REPORTING DURING THE CLASS PERIOD

36.   In order to inflate the price of Sonus' stock and to allow for certain insiders to sell over 250,000 shares of Sonus for gross proceeds of approximately $2 million, defendants caused the Company to falsely report its results for Q3 2003 to Q4 2003 through improper revenue recognition.

37.   The FY 2003 results were included in Form 10-Qs filed with the SEC. The results were also included in press releases disseminated to the public.

38.   Sonus will have to admit that it inappropriately recorded transactions included in its FY 2003 results, and it will have to restate those results to remove millions in improperly reported revenues, such that its FY 2003 financial statements were not a fair presentation of Sonus' results and were presented in violation of Generally Accepted Accounting Principles ("GAAP") and SEC rules.

39. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

40. In Sonus' 2002 Form 10-K, it represented that it recognized revenue in accordance with GAAP.

41. Pursuant to GAAP, which describes the accounting for revenues, revenue should not be recognized at a particular time unless there is persuasive evidence of an agreement, collection is probable and delivery has occurred.

42. During the Class Period, Sonus improperly recognized revenue even though these conditions did not exist.

43. Ultimately, on February 11, 2004, Sonus announced that its results would be delayed. However, in actuality, the Company will need to restate its FY 2003 results to eliminate millions in revenue that had been improperly recorded and increase its past-stated expenses.

44. The fact that Sonus will restate its financial statements for FY 2003 is an admission that the financial statements originally issued were false and that the

-13-

overstatement of revenues and income was material. Pursuant to GAAP, as set forth in

Accounting Principles Board Opinion ("APB") No. 20, the type of restatement announced

by Sonus was to correct for material errors in its previously issued financial statements.

*See* APB No. 20, ¶¶7-13. The restatement of past financial statements is a disfavored

method of recognizing an accounting change as it dilutes confidence by investors in the

financial statements, it makes it difficult to compare financial statements and it is often

difficult, if not impossible, to generate the numbers when restatement occurs. *See* APB

No. 20, ¶14. Thus, GAAP provides that financial statements should only be restated in

limited circumstances, *i.e.*, when there is a change in the reporting entity, there is a change

in accounting principles used or to correct an error in previously issued financial

statements. Sonus' restatement will not be due to a change in reporting entity or a change

in accounting principle, but rather to errors in previously issued financial statements. Thus,

the restatement will be an admission by Sonus that its previously issued financial results

and its public statements regarding those results were false.

  45.  Due to these accounting improprieties, the Company presented its

financial results and statements in a manner which violated GAAP, including the

following fundamental accounting principles:

  (a)  The principle that interim financial reporting should be based upon the

same accounting principles and practices used to prepare annual financial statements was

violated (APB No. 28, ¶10);

  (b)  The principle that financial reporting should provide information that is

useful to present and potential investors and creditors and other users in making rational

-14-

investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

( c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)    The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)    The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

-15-

(g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

46.     Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges, and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## COUNT I
### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

47.     Plaintiff incorporates ¶¶1-46 by reference.

48.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

-16-

49.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Sonus securities during the Class Period.

50.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Sonus securities. Plaintiff and the Class would not have purchased Sonus securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

51.    As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of the securities of Sonus during the Class Period.

### COUNT II
### For Violation of §20(a) of the 1934 Act
### Against All Defendants

52.    Plaintiff incorporates ¶¶1-51 by reference.

53.    The executive officers of Sonus prepared, or were responsible for preparing, the Company's press releases and SEC filings. The Individual Defendants controlled other employees of Sonus. Sonus controlled the Individual Defendants and each

of its officers, executives and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

54.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Sonus securities (the "Class") on the open market during the Class Period. Excluded from the Class are defendants, directors and officers of Sonus and their families and affiliates.

55.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. During the Class Period Sonus had more than 244 million shares of stock outstanding, owned by thousands of persons.

56.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the 1934 Act was violated by defendants;

(b)     Whether defendants omitted and/or misrepresented material facts;

(c)     Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and

(d)     Whether defendants knew or recklessly disregarded that their statements were false and misleading.

## PRAYER

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

(b)    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: March 2, 2004

           **SCHATZ & NOBEL, P.C.**

By: _____
           Andrew M. Schatz, Esq.
           Jeffrey S. Nobel, Esq.
           Justin S. Kudler, Esq. (BBO #644824)
           330 Main Street, 2nd Floor
           Hartford, Connecticut 061016
           Tel.: (860) 493-6292
           Fax: (860) 493-6290

           M. Clay Ragsdale, Esq.
           Ragsdale & Frese LLC
           The Farley Building  Suite 550
           1929 Third Avenue North
           Birmingham, AL  35203
           Telephone:    (205) 251-4775
           Facsimile:    (205) 251-4777

           Counsel for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF

I, Brian Clark, hereby certify that the following is true and correct to the best of my knowledge, information and belief:

1.     I have reviewed the complaint (the "Complaint") and would be willing to serve as a lead plaintiff on behalf of the class (the "Class") as defined in the Complaint, including providing testimony at deposition and trial, if necessary.

2.     I did not purchase the security that is the subject of this action at the direction of Plaintiffs' counsel or in order to participate in this private action.

3.     My transactions in the securities of Sonus Networks, Inc. during the Class Period defined in the Complaint were as set forth on Schedule A.

4.     During the three years prior to the date of this Certificate, I have not sought to serve, nor have I served, as a representative party on behalf of a class in any private action arising under the federal securities laws except for Clark et al. v Microtune, Inc. et al., 4:03cv82 (E.D. Tex 2002); Clark et al. v Guidant Corporation et al., 1:03cv980 (S.D. Ind. 2003); and Clark et al. v Solectron Corporation et al., 3:03cv986 (N.D. CA 2003).

5.     I will not accept any payment for serving as a representative party on behalf of the Class beyond my pro rata share of any possible recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __19__th day of February, 2004.


Brian Clark

BRIAN CLARK SONUS ACTION

## SCHEDULE A- TRANSACTIONS IN SONUS NETWORKS, INC.

### PURCHASES IN SONUS NETWORKS

| DATE | TRANSACTIONS | PRICE PER SHARE |
|------|--------------|-----------------|
| 1/21/2004 | 1500 | 8.84 |
| 1/28/2004 | 1500 | 8.74 |
| 1/28/2004 | 500 | 8.66 |
| 1/29/2004 | 1000 | 8.17 |
| 2/3/2004 | 1500 | 8.22 |
| 2/11/2004 | 1000 | 7.09 |
| 2/11/2004 | 1000 | 6.5 |
| 2/11/2004 | 1500 | 5.3 |

### SALES IN SONUS NETWORKS

| DATE | TRANSACTIONS | PRICE PER SHARE |
|------|--------------|-----------------|
| 1/21/2004 | 1500 | 8.94 |
| 1/29/2004 | 1000 | 8.28 |